# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:20-cv-00330-MR

| | | |
|---|---|---|
| JOY PONDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| CITY OF ASHEVILLE and | ) | |
| SCOTT BURNETTE, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment.  [Doc. 18].

## I.   PROCEDURAL BACKGROUND

On November 17, 2020, the Plaintiff Joy Ponder ("Plaintiff") filed this action against the City of Asheville alleging that she was discriminated against on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964 when she was involuntarily transferred from her role as Division Chief supervising the A-Shift at the Asheville Fire Department ("AFD").  [Doc. 1 at ¶¶ 112-119].   On February 5, 2021, the Plaintiff filed an Amended Complaint adding Defendant Scott Burnette, the Fire Chief of the AFD, to

this action. [Doc. 4]. In her Amended Complaint, the Plaintiff asserts three causes of action: (1) violation of Title VII of the Civil Rights Act, (2) intentional infliction of emotional distress, and (3) negligent infliction of emotional distress. [Id. at ¶¶ 120-132].

On November 1, 2021, the Defendants moved for summary judgment with respect to all of the Plaintiff's claims. [Doc. 18]. The Defendants also moved to exclude the opinion and testimony of the Plaintiff's expert, John D. Rukavina. [Doc. 20]. The Court has considered the Defendants' motion to exclude Mr. Rukavina's testimony in a separate Order.

## II. STANDARD OF REVIEW

Summary Judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" on the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

3

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255.

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff as the non-moving party, the following is a recitation of the relevant facts.

### A.     The Plaintiff's Employment at the Asheville Fire Department

The Plaintiff began working at the AFD as the Health and Safety Officer in 1998.  [Ponder Dep., Doc. 23-1 at 20; Rowe Dec., Doc. 18-2 at ¶ 5].  Over the subsequent twenty-one years, the Plaintiff was promoted multiple times at the AFD, serving as a Firefighter, Senior Firefighter, Lieutenant, Captain, Battalion Chief, and Division Chief.  [Ponder Dep., Doc. 23-1 at 21-38].  The Plaintiff was promoted to the position of Division Chief in 2014.  [<u>Id.</u> at 38].

Division Chief is a senior officer position within the AFD, and the department's Standard Operating Guidelines state that an individual in that role "[p]erforms administrative, professional and supervisory emergency scene work in directing emergency operations and related activities for a shift or division of the fire department."  [Doc. 18-3 at 28].  The Plaintiff was the Division Chief overseeing the AFD's A-Shift.  [Ponder Dep., Doc. 23-1 at 40].

4

In that role, the Plaintiff supervised the fire suppression and emergency response activities of twelve fire stations in Asheville, including three battalion chiefs and seventy-five firefighters. [Id. at 39; Ponder 2019 Affidavit, Doc. 23-3 at ¶ 12]. Division Chief is the highest-ranking position ever held by a female at the AFD, and the Plaintiff was the only female to have ever held a Division Chief position responsible for supervising a shift at the AFD. [Ponder Dep., Doc. 23-1 at 44; see also Burnette Dep., Doc. 23-22 at 28].

When the AFD gave formal performance reviews, the Plaintiff received excellent reviews. [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 6; Burnette Dep., Doc. 23-22 at 49]. She was considered a "stellar employee" at the AFD, including by Defendant Burnette, the AFD's Fire Chief. [Rowe Dep., Doc. 23-5 at 24]. In 2017, the Plaintiff was named as the AFD's "Most Outstanding Employee" by her peers. [Budzinski Dep., Doc. 23-2, at 36-37].

The City of Asheville has in place a process for documenting issues related to employee performance and conduct. [Rowe Dep., Doc. 23-5 at 18-22]. A corrective action form is used to document disciplinary action. [Id. at 19]. Alternatively, a coaching session form is used to document a conversation with an employee that is serious enough to be recorded but that does not result in discipline. [Id. at 21-22]. Department directors use

their judgment to determine whether a coaching session form is used.  [Id. at 27].  The Plaintiff's personnel file contains no corrective action or coaching session forms.  [Id. at 21, 23].

### B.    Events Prior to the Plaintiff's Transfer on June 12, 2019

Prior to the Plaintiff's transfer, some of the Plaintiff's responsibilities were removed over a two-year period.  [Ponder 2019 Affidavit 23-3 at ¶ 17]. First, her responsibilities related to the AFD's Lieutenant Testing Process were removed and given to a male employee.  [Ponder 2021 Affidavit 23-4 ¶ 4].  The Plaintiff's responsibilities related to health and safety matters were also removed and given to a male employee.  [Id. at ¶ 5].

Further, in 2018, the Plaintiff was not selected for training to become a certified instructor in the AFD's "Blue Card" management process while male chiefs – including four battalion chiefs, the Operations Chief, and Deputy Chief Christopher Budzinski – were selected.  [Ponder Dep., Doc. 23-1 at 87-88; Budzinski Dep., Doc. 23-2 at 74-75].  Similarly, the Plaintiff had to go through a "big ordeal" to receive credit for classes she took in a Chief Academy program while male employees did not have the same trouble receiving credit.  [Ponder Dep., Doc. 23-1 at 91-93].  On two other occasions, the Plaintiff's desk was given to a male employee while she was given another desk that was "almost worn out" and "falling apart," [id. at 76-79],

and the Plaintiff was not permitted to wear her AFD uniform to the North Carolina General Assembly while male officers had previously done so in violation of AFD policy, [id. at 154-56; Burnette Dep., Doc. 23-2 at 243-251].

### C. The Plaintiff's Transfer on June 12, 2019

On June 12, 2019, Chief Burnette and Deputy Chief Budzinski transferred the Plaintiff from her supervisory role overseeing the AFD's A-Shift to a special projects role preparing the AFD's strategic plan. [Ponder 2019 Affidavit, Doc. 23-3 at ¶¶ 11-13; see also Burnette Dep., Doc. 23-22 at 113]. As part of the Plaintiff's transfer, she was moved from a shift schedule to a traditional day schedule with "maximum flexibility." [Ponder Dep., Doc. 23-1 at 163-65; Burnette Dep. Doc. 23-22 at 238-40]. Employees on a shift schedule are scheduled based on a repeating pattern of on-work and off-work periods such that they have eight 24-hour periods off every twelve days. [Budzinski Dep., Doc. 23-1 at 114]. Employees on a traditional day schedule work from 9:00 a.m. to 5:00 p.m., five days a week. [Id. at 114-15].

The parties dispute whether the "maximum flexibility" afforded to the Plaintiff would alleviate any hardship imposed from switching from a shift schedule to day schedule. Chief Burnette testified that "maximum flexibility means that any conflict that she has will be honored." [Burnette Dep., Doc. 23-22 at 240]. However, the Plaintiff told Chief Burnette and Deputy Chief

Budzinski that she had planned outings with her son every four days because she would have those days off on a shift schedule. [Ponder Dep., Doc. 23-1 at 164-65]. The Plaintiff expressed concern that she would fail in her new role if she kept those plans because she "wouldn't be there." [Id.].

Although the Plaintiff retained her title as Division Chief and remained at the same pay scale, [id. at 169; see also Burnette Dec., Doc. 18-3 at ¶ 47], her responsibilities supervising the AFD's A-Shift were removed and given to a male officer, [Ponder 2019 Affidavit, Doc. 23-3 at ¶¶ 12-13; Ponder 2021 Affidavit, Doc. 23-4 at ¶ 3; Budzinski Dep., Doc. 23-2 at 101-02; Burnette Dep., Doc. 23-22 at 112-14, 256]. The parties dispute whether the Plaintiff retained any connection to emergency scene work, [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 19; Burnette Dep., Doc. 23-22 at 204-06], but they agree that, following the Plaintiff's transfer, she did not supervise any shift within the AFD or any division of the AFD, [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 19; see also Burnette Dep., Doc. 23-22 at 114]. Instead, the Plaintiff was tasked with preparing the AFD's strategic plan under the "close supervision" of Chief Burnette and Deputy Chief Budzinski. [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 13; Ponder Dep., Doc. 23-1 at 164; Burnette Dep., Doc. 23-22 at 113-14]. Chief Burnette testified that the Plaintiff's transfer from her supervisory role over the A-Shift was "temporary," but he did not tell

8

the Plaintiff how long the transfer would last, stating only that she would return to supervising the A-Shift "once her performance improved." [Burnette Dep., Doc. 23-22 at 217-18; see also Ponder Dep., Doc. 23-1 at 164].

The parties dispute whether the Plaintiff's transfer was communicated truthfully to other employees at the AFD. Chief Burnette and Deputy Chief Budzinski instructed the Plaintiff to tell others that she had agreed to the transfer. [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 14]. Later, Deputy Chief Budzinski told other employees at the AFD that the Plaintiff had "graciously volunteered" or "graciously accepted" the transfer. [Brown Affidavit, Doc. 23-6 at ¶ 5; Berry Affidavit, Doc. 23-15 at ¶ 7; Budzinski Dep., 23-2 at 84]. The Plaintiff disputes this characterization because she did not agree to the transfer. [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 15].

Plaintiff claims that her transfer was the result of sex-based discrimination. [See Doc. 23 at 2]. The Defendants, however, dispute this and assert that the Plaintiff was transferred because of poor performance in her role as Division Chief. [Burnette, Dec., Doc. 18-3 at ¶ 42-43]. On June 17, 2019, Chief Burnette drafted an unsigned and undelivered letter to the Plaintiff summarizing the June 12, 2019 meeting and explaining that the Plaintiff was transferred because of several performance deficiencies, including, but not limited to, abdicating responsibility, exhibiting a lack of

9

global understanding and awareness, and exhibiting poor teamwork and communication. [See Doc. 18-3 at 39-42]. In his deposition testimony, Chief Burnette offered several specific examples of the deficiencies outlined in the June 17, 2019 letter. [Burnette Dep., Doc. 23-22 at 63-110]. For instance, Chief Burnette testified that the Plaintiff's failure to inform him of her involvement in a 2018 study conducted by UNC Asheville about Post-Traumatic Stress Disorder ("PTSD") in AFD firefighters and her failure to share information about the study showed abdication of responsibility, poor communication, an inability to follow instructions, and a lack of global understanding and awareness. [Id. at 63-66, 74, 79]. Chief Burnette also provided additional examples where, in his view, the Plaintiff exhibited poor participation in communication workshops, poor teamwork in failing to give feedback to colleagues at the appropriate time, poor communication in failing to share concerns from firefighters assigned to A-Shift, and an inability to follow directions. [Id. at 92, 96, 98-100, 103].

The parties dispute the extent to which Chief Burnette, Deputy Chief Budzinski, and the Plaintiff discussed the Plaintiff's alleged performance deficiencies prior to June 12, 2019. The performance deficiencies outlined in the letter had never been presented to the Plaintiff in any written format even though she requested that Chief Burnette provide specific examples of

10

her performance deficiencies in writing.[1]  [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 8; Ponder Dep., Doc. 23-1 at 125].  However, Deputy Chief Budzinski testified that he took notes documenting a conversation with the Plaintiff on February 18, 2019 in which they discussed getting an update related to the PTSD study as well as other health and safety matters, Budzinski "[e]xplained expectations of notifying when she would be off and who is covering," and he "advise[d] [her to] stop by and update [him] at least once per tour."  [Budzinski Dep., Doc. 23-2 at 69-71, 123-24].  Additionally, Chief Burnette's June 17, 2019 letter states that he had previously spoken with the Plaintiff about some of her alleged deficiencies on two prior occasions, including speaking to her about the 2018 PTSD study on February 14, 2019 in the "bat cave," a parking area at the AFD.  [See Doc. 18-3 at 39-42].  The Plaintiff disputes Chief Burnette's characterization of their interaction in the bat cave.  The Plaintiff, instead, testified that the meeting in the bat cave "was not a meeting about performance" and that Chief Burnette used derogatory language, calling her a "poor leader" and a "disappointment" who would not succeed at the AFD.  [Ponder Dep., Doc. 23-1 at 123-27].  During the bat cave interaction, the Plaintiff told Chief Burnette "I don't want to be

---

[1] The Plaintiff was later given a copy of the June 17, 2019 letter on October 21, 2019, when Defendant City of Asheville marked the June 17, 2019 letter as an exhibit related to a grievance filed by the Plaintiff.  [See Ponder 2019 Affidavit, Doc. 23-3 at ¶ 7].

alone with you. I don't want to be around you. I need somebody with me. You need to stop doing this." [Id. at 126-27].

The Plaintiff described approximately four other similar interactions with Chief Burnette between March of 2017 and June of 2019. [Id. at 51, 107-08, 123-25, 161, 170-71]. On one such occasion Chief Burnette spoke to the Plaintiff in an aggressive manner after a staff meeting and called her a "poor leader" and a "disappointment," but afterward offered to give her a hug. [Id. at 111-12]. Chief Burnette used similar language during the June 12, 2019 meeting when the Plaintiff was transferred out of her role overseeing the A-Shift. [Id. at 161]. The Plaintiff feared for her job during these interactions with Chief Burnette and described herself as "upset" and "embarrassed" following these interactions. [See, e.g., id. at 55, 110, 125, 127]. During these interactions, the Plaintiff also told Chief Burnette that he needed to "stop doing this," that she wanted other individuals or a Human Resources Representative present, and that she found the June 12, 2019 meeting to be "kind of intimidating and threatening." [Id. at 125, 158, 171; Doc. 23-19 at 24].

The Plaintiff could not recall Chief Burnette mentioning her gender during these interactions. [Ponder Dep., 23-1 at 106, 132]. However, on one occasion while she was Division Chief, the Plaintiff overheard Deputy

Chief Budzinski state that she "couldn't handle" managing a particular incident at a fire scene because she was a woman. [Id. at 98-100].

Although Chief Burnette yelled or lost his temper with other employees, [id. at 186; McElreath Affidavit, Doc. 23-16 at ¶ 9], other employees at the AFD observed Chief Burnette treat the Plaintiff in a more hostile manner than the male chiefs at the AFD, [Johnson 2021 Affidavit, Doc. 23-13 at ¶¶ 6-7; Berry Affidavit, Doc. 23-15 at ¶¶ 8-11; McElreath Affidavit, Doc. 23-16 at ¶¶ 4-9]. For example, James Darren McElreath, a retired Battalion Chief, observed that "Chief Burnette often seemed to either ignore or overlook Chief Ponder's ideas or suggestions or actively shoot them down without discussion or consideration." [McElreath Affidavit, Doc. 23-16 at ¶ 5]. Similarly, Chris Johnson, who served as the AFD's Safety and Training Officer at the time of the events giving rise to this lawsuit, observed "Chief Burnette treat Chief Ponder in . . . a hostile manner by aggressively questioning her or becoming angry when she spoke or, alternatively, a condescending manner, either by ignoring her or by acting dismissively toward her and any ideas, suggestions, or statements she made." [Johnson 2021 Affidavit, Doc. 23-13 at ¶ 6]. Although Johnson was equally involved in the 2018 PTSD study and was listed as the study's co-author, he did not

receive criticism from Chief Burnette related to the study.[2]  [Id. at ¶¶ 8-14].

Another female firefighter at the AFD also stated she had two interactions

with Chief Burnette where he "singled [her] out for hostile, aggressive and

publicly demeaning treatment."  [Bell Affidavit, Doc. 23-17 at ¶ 4].

Other employees at the AFD also explained that it is highly unusual for

an employee to be involuntarily transferred to a special project assignment

or a different schedule, that such a transfer is viewed as a punishment, and

that such a schedule change creates hardship for an employee's personal

life.  [Johnson 2019 Affidavit, Doc. 23-11 at ¶¶ 6-7; see also Brown Affidavit,

Doc. 23-6 at ¶¶ 5-6, 8; Wilson Affidavit, Doc. 23-9 at ¶¶ 5, 7; Mullins Affidavit,

Doc. 23-10 at ¶ 5].  Instead, special assignment roles are typically filled with

volunteers.  [Brown Affidavit, Doc. 23-6 at ¶ 6; Wilson Affidavit, Doc. 23-9 at

¶ 6; Johnson 2019 Affidavit, Doc. 23-11 at ¶ 6].  Although there were

volunteers to prepare the AFD's strategic plan, the Plaintiff was involuntarily

transferred into this role.  [Burnette Dep., Doc. 23-22 at 242-43].

Chief Burnette and Deputy Chief Budzinski could recall only one other

specific instance where an employee was involuntarily transferred from a

---

[2] Although Johnson states that he was equally involved in the 2018 PTSD study, Chief
Burnette testified that he did not perceive Johnson's lack of communication regarding
the study as a performance deficiency because Johnson was of a lower rank than the Plaintiff,
and Chief Burnette understood Johnson's involvement in the study to be more limited
than the Plaintiff's involvement.  [Burnette Dep., Doc. 23-22 at 85].

shift schedule to a day schedule, and, in that instance, a male firefighter was involuntarily transferred following concerns about his performance at the scene of a fire and the firefighter's own concerns about becoming injured just before retirement.  [Id. at 242; Budzinski Dep., Doc. 23-2 at 67-68].  On two other occasions, a battalion chief was involuntarily transferred to a different battalion and a senior fire specialist was involuntarily demoted and assigned new responsibilities.  [Burnette Dep., Doc. 23-22 at 202, 208-09].  On both of those occasions, the employees remained on the same schedule, and the involuntary transfers were documented on corrective action forms as disciplinary actions.  [Id.].  Chief Burnette testified that the Plaintiff was not demoted and that her transfer was, instead, a "performance and a support plan."  [Id. at 50, 210].

### D.  The Plaintiff's FMLA Leave and Medical Retirement

The Plaintiff reported to work in her new role on June 17, 2019. [Ponder Dep., Doc. 23-1 at 170].  That morning, the Plaintiff and Chief Burnette had another interaction where Chief Burnette "started whispering in [her] ear" and told the Plaintiff to report to his office "if [she] knew what was good for [her]."  [Id. at 170-71].  Chief Burnette refused the Plaintiff's request to have another individual with them in the meeting.  [Id.].  Barbara Berry, the administrative assistant at the AFD, witnessed this interaction between

the Plaintiff and Chief Burnette and explained that she "has never seen a male officer treated in this manner within the Department." [See id. at 171; see also Berry Affidavit, Doc. 23-15 at ¶¶ 8-11].

Later that day, the Plaintiff left work under FMLA leave. [Ponder Dep., Doc. 23-1 at 178]. While the Plaintiff was on FLMA leave, she began seeing mental healthcare providers for anxiety and trouble sleeping that started after her transfer. [Id. at 243-44]. The Plaintiff also filed a grievance with the City of Asheville, alleging that she was involuntarily transferred from her position, that she was subjected to a hostile and harassing work environment because of her gender, and that she was retaliated against for advocating for health and wellness issues within the AFD and for taking FMLA leave. [Doc. 23-19, at 4-6]. The City of Asheville conducted an investigation, and, on December 19, 2019, the investigator issued a report denying the Plaintiff's grievance. [See Doc. 23-14]. On November 27, 2019, the Plaintiff filed an EEOC Charge against the City of Asheville alleging sex discrimination in violation of Title VII of the Civil Rights Act. [Doc. 4 at ¶ 3]. On August 20, 2020, the EEOC issued a right-to-sue letter. [Id. at ¶ 4].

On December 4, 2019, the Plaintiff returned from FMLA leave. [Ponder Dep., Doc. 23-1 at 178]. On December 6, 2019, the Plaintiff met with Chief Burnette and Deputy Chief Budzinski, and Chief Burnette gave the Plaintiff

a written copy of the unsigned June 17, 2019 letter outlining the Plaintiff's alleged performance deficiencies. [Ponder Dep., Doc. 23-1 at 217-18]. On June 1, 2020, the Plaintiff medically retired from the AFD. [Rowe Dec., Doc. 18-2 ¶ 19].

## IV. DISCUSSION

### A. Title VII Claims Against Defendant Scott Burnette

The Defendants argue that the Plaintiff's Title VII claims against Defendant Burnette in his individual capacity "fail as a matter of law because Title VII does not convey individual liability." [Doc. 19 at 10].

The Fourth Circuit has instructed that "supervisors are not liable in their individual capacities for Title VII violations." Lissau v. S. Food Serv., Inc., 159 F.3d 177, 181 (4th Cir. 1998). Accordingly, the Defendants' Motion for Summary Judgment is granted with respect to all Title VII claims asserted by the Plaintiff against Defendant Burnette in his individual capacity.

### B. Disparate Treatment in Violation of Title VII

In the Plaintiff's first cause of action, she alleges that the Defendants violated Title VII of the Civil Rights Act by "subject[ing] [her] to an adverse transfer and effective demotion on the basis of her sex." [Doc. 4 at ¶ 125].

Title VII provides that an employer shall not "discriminate against any individual … because of such individual's … sex." 42 U.S.C. § 2000e-

2(a)(1). A plaintiff may survive summary judgment by establishing a sex

discrimination claim under Title VII using the "pretext" framework, "under

which the employee, after establishing a prima facie case of discrimination,

demonstrates that the employer's proffered permissible reason for taking an

adverse employment action is actually a pretext for discrimination." Hill v.

Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en

banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

570 U.S. 338, 133 S. Ct. 2517, 2533, 186 L.Ed.2d 503 (2013). To establish

a prima facie case of discrimination, a plaintiff must show that:

> (1) she is a member of a protected class; (2) her
> employer took an adverse action against her; (3) she
> had been fulfilling her employer's legitimate
> expectations at the time of the adverse action; and
> (4) the adverse action occurred under circumstances
> that raise a reasonable inference of unlawful
> discrimination, including because the employer left
> open the position or replaced the plaintiff with
> someone outside the protected class.

Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 649-50 (4th Cir. 2021).

If the plaintiff presents a prima facie case of discrimination, then "the burden

shifts to the employer to articulate a legitimate, nondiscriminatory reason for

the adverse employment action." Hill, 354 F.3d at 285. If the defendant

meets its burden of production, then the presumption created by the prima

facie case is rebutted and "drops from the case." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 n. 10, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

Once the employer satisfies its burden, the burden then shifts to the plaintiff to show that the defendant's proffered reason is pretextual. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000). At the summary judgment stage, however, the plaintiff need only "cast sufficient doubt upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing." Guessous v. Fairview Prop. Invs. LLC, 828 F.3d 208, 217-81 (4th Cir. 2016) (quoting King v. Rumsfeld, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting)). At this stage, the plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdline, 450 U.S. at 256. Although the burden of production shifts between the parties, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253.

The parties do not dispute that the Plaintiff is a member of a protected class and, therefore, the Plaintiff has established the first element of her prima facie case of discrimination.

Under the second element required to establish a prima facie case of discrimination, "a plaintiff need not 'show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting her employer's legitimate expectations.'" Sempowich, 19 F.4th at 650 (quoting Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019)). The Plaintiff has presented evidence that she had previously received excellent performance reviews, [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 6; Burnette Dep., 23-22 at 49]; that she was considered a "stellar employee" by others at the AFD, including Chief Burnette, [Rowe Dep., Doc. 23-5 at 24]; that she was named the AFD's "Most Outstanding Employee" by her peers in 2017, after she had become a Division Chief, [Budzinski Dep., Doc. 23-2, at 36-37]; and that there was no documentation in her personnel file indicating that she had been subject to any formal disciplinary action or that she had received any informal coaching sessions related to her job performance, [Rowe Dep., Doc. 23-5 at 21, 23]. The Plaintiff's forecast of evidence, when viewed in the light most favorable to her, creates an issue of material fact as to whether she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action. See Sempowich, 19 F.4th at 650 ("If an employer genuinely believed that one of its employees was

performing poorly on metrics the employer perceives as critical . . . it seems likely that it would at the very least not rate the employee's performance highly or give her awards, a salary raise, or an equity grant.").

Under the third element needed to establish a prima facie case, "[a]n adverse [employment] action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Swaso v. Onslow Cnty. Bd. Of Educ., 698 F. App'x 745, 748 (4th Cir. 2017) (quoting Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011)). The Plaintiff retained her title and salary following her transfer, and Chief Burnette testified that the transfer was not a demotion. [Burnette Dec., Doc. 18-3 at ¶ 47; Burnette Dep., Doc. 23-22 at 210]. However, the Plaintiff has presented evidence that she was reassigned with significantly different responsibilities. Specifically, the Plaintiff presented evidence that her responsibilities supervising the AFD's A-Shift were removed, and she no longer supervised any shift or division at the AFD following her transfer. [Budzinski Dep., Doc. 23-2 at 101-02; Burnette Dep., Doc. 23-22 at 112-14]. Although Chief Burnette testified that the Plaintiff's reassignment to prepare the AFD's strategic plan was temporary, the Plaintiff was not told how long her transfer would last and was told only that she

would return to supervise the A-Shift "once her performance improved." [Burnette Dep., Doc. 23-22 at 217-18]. Further, the Plaintiff presented evidence that an involuntary transfer from a shift schedule to a day schedule is viewed as a "punishment" at the AFD and creates a personal hardship for the transferred employee. [Johnson 2019 Affidavit, Doc. 23-11 at ¶ 7]. Although Chief Burnette disputes that the schedule change would present a hardship for the Plaintiff because he granted her "maximum flexibility," [Burnette Dep., Doc. 23-22 at 240], the Plaintiff explained that even a schedule change with "maximum flexibility" would conflict with plans she had made with her son, [Ponder Dep., Doc. 23-1 at 164-65]. This evidence presented by the Plaintiff, when viewed in the light most favorable to her, creates an issue of material fact as to whether the Plaintiff's transfer was an adverse employment action.

Under the fourth element required to establish a prima facie case of discrimination, the parties do not dispute that the Plaintiff's supervisory responsibilities over the AFD's A-Shift were assumed by a male employee. [Budzinski Dep., Doc. 23-2 at 102; Burnette Dep., Doc. 23-22 at 256; Ponder 2021 Affidavit, Doc. 23-4 at ¶ 3].

The Plaintiff also presented additional evidence such that a reasonable juror could infer that the Plaintiff's transfer was the result of unlawful

discrimination. For instance, the Plaintiff presented statements from other AFD employees explaining how her involuntary transfer was unusual. [Johnson 2019 Affidavit, Doc. 23-11 at ¶¶ 6-7; <u>see also</u> Brown Affidavit, Doc. 23-6 at ¶¶ 5-6, 8; Wilson Affidavit, Doc. 23-9 at ¶¶ 5, 7; Mullins Affidavit, Doc. 23-10 at ¶ 5]. In fact, Chief Burnette and Deputy Chief Budzinski could recall only one other AFD employee who was involuntarily transferred from a shift schedule to a day schedule and, in that instance, a male firefighter was transferred after a performance issue at the scene of a fire. [Burnette Dep., Doc. 23-22 at 218, 242; Budzinski Dep., Doc. 23-2 at 67-68]. In two other instances, employees were involuntarily reassigned to different positions or responsibilities as a disciplinary matter documented on corrective action forms. [Burnette Dep., Doc. 23-22 at 202, 208-09]. The Plaintiff, however, had no documented performance issues in her personnel file, [Rowe Dep., Doc. 23-5 at 21, 23], and she was provided no other written documentation of her alleged deficiencies prior to the transfer, despite her requests for such documentation during her interactions with Chief Burnette, [<u>see</u> Ponder 2019 Affidavit, Doc. 23-3 at ¶ 8; Ponder Dep., Doc. 23-1 at 125].

The Plaintiff also presented a forecast of evidence that there were other events suggestive of potential discrimination leading up to the transfer from which a reasonable juror could infer that the Plaintiff's transfer was

discriminatory. For example, the Plaintiff presented evidence that she had other job responsibilities removed and given to male employees, [Ponder 2021 Affidavit, Doc. 23-4 at ¶¶ 4-5; Ponder Dep., Doc. 23-1 at 147, 195-96], that she was not selected to be trained as a "Blue Card" instructor while all male employees were selected, [Ponder Dep., Doc. 23-1 at 87-88; Budzinski Dep., Doc. 23-2 at 74-75], that she had trouble receiving credit for classes she took in the Chief Academy program, [Ponder Dep., Doc. 23-1 at 91-93], that her desk was given to a male employee and replaced with a desk that was "falling apart," [id. at 76-79], and that she was not permitted to wear her AFD uniform to the N.C. General Assembly while male employees had done so in the past in violation of AFD policy, [id. at 154-56; Burnette Dep., Doc. 23-2 at 243-251].[3] Further, the Plaintiff presented evidence that Chief Burnette treated her differently than he treated male chiefs at the AFD by speaking to her in a more aggressive or intimidating manner, [Ponder Dep., Doc. 23-1 at 110-12, 123-27; Johnson 2021 Affidavit, Doc. 23-13 at ¶¶ 6-7;

---

[3] The Defendants argue that the Plaintiff has abandoned allegations of disparate treatment related to the "Blue Card" training, the Chief Academy, and the removal of her duties with the Lieutenant Testing Process and health and safety matters because those events occurred more than 180 days prior to the Plaintiff's EEOC Charge, and they are, therefore, time-barred. [Doc. 27 at 2-3]. Although the Plaintiff cannot assert a disparate treatment claim based on these events, the Court may consider evidence related to these events as evidence tending to show that the Plaintiff was involuntarily transferred due to her sex. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L.Ed.2d 106 (2002) (stating that Title VII does not "bar an employee from using [evidence of] prior acts as background evidence in support of a timely claim").

24

Berry Affidavit, Doc. 23-15 at ¶¶ 8-11; McElreath Affidavit, Doc. 23-16 at ¶¶ 4-9], and that another female firefighter also experienced similarly aggressive treatment from Chief Burnette, [Bell Affidavit, Doc. 23-17 at ¶ 4].

Viewing the forecast of evidence in the light most favorable to the Plaintiff as the nonmoving party, the Plaintiff has presented evidence creating genuine issues of material fact as to the elements of her prima facie case. See Sempowich, 19 F.4th at 651 ("[A] court cannot grant a party summary judgment when there are genuine issues of material fact, and here the record reveals factual disputes as to . . . the key elements of [the plaintiff's] prima facie case.").

The Defendants have articulated a legitimate, nondiscriminatory reason for the Plaintiff's transfer by stating that the Plaintiff was temporarily transferred out of her role supervising the AFD's A-Shift because she exhibited performance deficiencies in that role. [Burnette, Dec., Doc. 18-3 at ¶ 42-43; Burnette Dep., Doc. 23-22 at 63-110]. However, "[t]he record is replete with genuine issues of material fact that go to the heart of the pretext issue." Sempowich, 19 F.4th at 651.

Although Chief Burnette described several instances in which he observed the Plaintiff's performance deficiencies, [Burnette Dep., Doc. 23-22 at 63-110], there was no documentation regarding the Plaintiff's alleged

performance deficiencies in her personnel file, [Rowe Dep., Doc. 23-5 at 21, 23], and the Plaintiff was not presented with any written document outlining the alleged deficiencies prior to her transfer, [Ponder 2019 Affidavit, Doc. 23-3 at ¶ 8]. While Chief Burnette testified that he spoke with the Plaintiff about her performance deficiencies, [see Doc. 18-3 at 39-42; see also Burnette Dep., Doc. 23-22 at 69-70, 89-90], the Plaintiff disputed Burnette's characterization of those interactions and testified that Burnette spoke to her in an aggressive and demeaning manner, [see Ponder Dep., Doc. 23-1 at 126]. As previously noted, the Plaintiff also supported her characterization of her interactions with Chief Burnette by presenting statements from other AFD employees who witnessed Burnette treat the Plaintiff more aggressively than male employees. [Johnson 2021 Affidavit, Doc. 23-13 at ¶¶ 6-7; Berry Affidavit, Doc. 23-15 at ¶¶ 8-11; McElreath Affidavit, Doc. 23-16 at ¶¶ 4-9].

Moreover, "[d]eviation from regular procedures is a classic example of evidence used to show pretext." Johnson v. City of Charlotte, 229 F. Supp. 2d 488, 496 (W.D.N.C. Oct. 2, 2002). The Plaintiff presented numerous statements from AFD employees explaining that the Defendants deviated from normal procedures by transferring the Plaintiff into a position that is typically filled by volunteers, moving the Plaintiff from a shift schedule to a day schedule, and announcing that the Plaintiff had either "graciously

accepted" or "graciously volunteered" for the special projects position when the Plaintiff disputes that characterization. [See Brown Affidavit, Doc. 23-6 at ¶¶ 5-6; Wilson Affidavit, Doc. 23-9 at ¶ 5, 7; Mullins Affidavit, Doc. 23-10 at ¶ 5; Johnson 2019 Affidavit, Doc. 23-11 at ¶ 6; Berry Affidavit, Doc. 23-15 at ¶ 7; Budzinski Dep., 23-2 at 84].

For all these reasons, the Plaintiff has cast sufficient doubt on the Defendants' proffered reason for the transfer. Accordingly, the Defendants' Motion for Summary Judgement is denied with respect to the Plaintiff's claim that the Defendants transferred the Plaintiff out of her role supervising the AFD's A-Shift because of her sex in violation of Title VII.[4]

---

[4] The Plaintiff also argues that she survives summary judgment under the "mixed-motive" framework. [Doc. 23 at 27]. Under the mixed-motive framework:

> [A] plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex . . . discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor. In such cases . . . it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons.

Hill, 354 F.3d at 284. Because the Plaintiff's disparate treatment claim survives summary judgment under the pretext framework, the Court need not analyze the evidence presented under the mixed-motive framework.

**C.    Hostile Work Environment in Violation of Title VII**

In her first cause of action, the Plaintiff also alleges that that the Defendants "have harassed and subjected Plaintiff to a hostile work environment on the basis of her sex" in violation of Title VII.  [Doc. 4 at ¶ 123].  The Defendants argue that the Plaintiff's hostile work environment claim fails as a matter of law because the Plaintiff cannot show that the alleged harassment occurred due to her sex or that the alleged harassment was severe or pervasive.  [Doc. 19 at 10-19].

The Plaintiff does not address the Defendants' arguments with respect to her hostile work environment claim.  [See Doc. 23].  Accordingly, the Plaintiff has abandoned her Title VII hostile work environment claim.  See Chamberlain v. Securian Fin. Grp., Inc., 180 F. Supp. 3d 381, 405 (W.D.N.C. Feb. 19, 2016) (holding that the plaintiff abandoned her claims when she did not address the defendants' arguments in her opposition to the defendant's motion for summary judgment); see also Rehabcare Grp. East, Inc. v. Brookwood Victoria Health Care Ctr., LLP, No. 1:06-CV-239, 2007 WL 2344811, at *1, 6 (W.D.N.C. Aug. 15, 2007) (same).  However, even if the Plaintiff had not abandoned her hostile work environment claim, the Defendants are entitled to summary judgment because the actions alleged by the Plaintiff in her Amended Complaint and described in the evidence

presented by the Plaintiff in support of her opposition to the Defendants' Motion for Summary Judgment are not sufficiently severe or pervasive to sustain a claim for a hostile work environment.

To sustain a claim for a hostile work environment, the Plaintiff must demonstrate: (1) that she was subjected to unwelcome harassment; (2) that the harassment was because of her protected status; (3) that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere"; and (4) that the harassing conduct is imputable to the employer. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008). In establishing the "severe or pervasive" nature of the work environment, the Plaintiff must show not only that she "subjectively perceive[d] the environment to be abusive," but also that "a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." Id. at 315 (internal quotation marks and citations omitted).

To determine whether a jury could find that a work environment was objectively abusive, courts consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Ocheltree

v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)). "This standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998)) (internal quotation marks omitted). Instead, Title VII is violated "when an employee's workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015) (internal quotation marks omitted).

In her Amended Complaint, the Plaintiff alleges that Chief Burnette "consistently treated [her] in a personally demeaning, hostile and harassing manner" by "yelling at [her and] forcing her into meetings either alone or with only Deputy Chief Budzinski present where [they] would berate her and attempt to intimidate her . . . ." [Doc. 4 at ¶¶ 85-86]. In her deposition testimony, the Plaintiff described approximately five instances of such interactions over a period of approximately three years. [Ponder Dep., Doc. 23-1 at 51, 107-08, 123-25, 161, 170-71]. Further, the Plaintiff presented

evidence that Chief Burnette would "at times lose his temper in staff meetings or other settings," [McElreath Affidavit, Doc. 23-16 at ¶ 9], and treated another female firefighter in a "hostile, aggressive and publicly demeaning" manner on two occasions, [Bell Affidavit, Doc. 23-17 at ¶ 4]. The Plaintiff also presented evidence that numerous job responsibilities were removed from her, [Ponder 2021 Affidavit, Doc. 23-4 at ¶¶ 4-5; Ponder Dep., Doc. 23-1 at 147, 195-96], she was not selected for "Blue Card" instructor training, [Ponder Dep., Doc. 23-1 at 87-88; Budzinski Dep., Doc. 23-2 at 74-75], she had to go through a "big ordeal" to receive credit for classes taken in the Chief Academy program, [Ponder Dep., Doc. 23-1 at 91-93], her desk was replaced with one of a lower quality, [id. at 76-79], and she was not permitted to wear her AFD uniform to the N.C. General Assembly, [id. at 154-56; Burnette Dep., Doc. 23-2 at 243-251]. In her Amended Complaint, the Plaintiff alleges that these events, in addition to her transfer on June 12, 2019, are also part of the Defendants' alleged pattern of hostile and harassing treatment. [See Doc. 4 at ¶¶ 60-83].

Plaintiff's evidence of the Defendants' conduct falls short of the threshold for a sufficient forecast of evidence to create an issue of fact regarding an abusive work environment. See Sunbelt Rentals, Inc., 521 F.3d at 315 ("Workplaces are not always harmonious locales, and even incidents

31

that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."); see also Buchhagen v. ICF Intern., Inc., 545 F. App'x 217, 220 (4th Cir. 2013) (holding that a supervisor's conduct was not "severe or pervasive" where the plaintiff alleged that the supervisor "mockingly" yelled at the plaintiff, yelled and pounded on her desk in a meeting, "repeatedly harp[ed]" on the plaintiff's mistakes, made "snide" comments about the plaintiff, pitted employees against each other, and criticized the plaintiff's use of leave time over a period of nine months). While this evidence may be received to show the gender-based motivation for the Defendant's decision regarding Plaintiff's position of employment, it is an insufficient forecast regarding a hostile environment. Accordingly, the Defendants' Motion for Summary Judgment is granted with respect to the Plaintiff's hostile work environment claim.

### D. Intentional Infliction of Emotional Distress

In the Plaintiff's second cause of action, she alleges that the Defendants' actions "were intended to and did inflict severe emotional and mental distress on the Plaintiff." [Doc. 4 at ¶ 129]. The Defendants argue that the Plaintiff's intentional infliction of emotional distress claim fails as a matter of law because she does not present a sufficient forecast of extreme and outrageous conduct on the part of the Defendants. [Doc. 19 at 24]. The

Plaintiff does not address the Defendants' argument with respect to her claim for intentional infliction of emotional distress, and she has, therefore, abandoned it. See Chamberlain, 180 F. Supp. 3d at 405; see also Rehabcare Grp. East, Inc., 2007 WL 2344811, at *6. However, even if the Plaintiff had not abandoned her claim for intentional infliction of emotional distress, the Defendants are entitled to summary judgment because Plaintiff's forecast regarding the Defendant's conduct is insufficient to create a genuine issue as to whether it was extreme and outrageous.

To assert a claim for intentional infliction of emotional distress, the Plaintiff must show (1) extreme and outrageous conduct by the Defendants, (2) which was intended to and did in fact cause (3) severe emotional distress. Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354, 595 S.E.2d 778, 782 (2004) (internal quotation marks and citation omitted). The threshold determination of whether the alleged conduct may be considered extreme and outrageous is a question of law. Id.

The Plaintiff's forecast regarding Defendants' conduct does not meet this threshold. Although the Plaintiff found the Defendants' conduct offensive and even, at times, demeaning, it does not rise to the level of being "utterly intolerable" in civilized society. See Dwyer v. Smith, 867 F.2d 184, 194-95 (4th Cir. 1989) (affirming the district court's conclusion that the plaintiff had not alleged extreme and outrageous conduct when that same conduct was insufficient to sustain a hostile work environment claim); see also Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 774 (4th Cir. 1997) (holding that conduct that is "inconsiderate and insulting" is insufficient to establish a claim for intentional infliction of emotional distress); Lopez-Galvan v. Mens Wearhouse, No. 3:06-CV-537, 2008 WL 2705604, at *11 (W.D.N.C. July 10, 2008) (concluding that repeated rude remarks and insults did "not rise to the level of outrageous conduct"). Accordingly, the Defendants' Motion for Summary Judgment is granted with respect to the Plaintiff's intentional infliction of emotional distress claim.

### E. Negligent Infliction of Emotional Distress

In the Plaintiff's third cause of action, she asserts a claim for negligent infliction of emotional distress. [Doc. 4 at ¶¶ 130-132]. The Defendants argue that the Plaintiff's claim fails as a matter of law because the Plaintiff's forecast is insufficient to raise the inference that the Defendants could

reasonably foresee that their conduct would cause the Plaintiff severe emotional distress. [Doc. 19 at 24-25]. The Plaintiff does not address the Defendants' argument with respect to her claim for intentional infliction of emotional distress, and she has, therefore, abandoned it. See Chamberlain, 180 F. Supp. 3d at 405; see also Rehabcare Grp. East, Inc., 2007 WL 2344811, at *6. However, even if the Plaintiff had not abandoned her claim for intentional infliction of emotional distress, the Defendants are entitled to summary judgment because the Plaintiff has not alleged or presented evidence showing that the Defendants could reasonably foresee that their conduct would cause her severe emotional distress.

To sustain a claim for negligent infliction of emotional distress, the Plaintiff must show that (1) the Defendants negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the Plaintiff severe emotional distress or mental anguish, and (3) the conduct did in fact cause the Plaintiff severe emotional distress. Bonham v. Wolf Creek Acad., 767 F. Supp. 2d 558, 573 (W.D.N.C. Feb. 9, 2011). In North Carolina, "severe emotional distress" is defined as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do

35

so." Williams v. HomEq Servicing Corp., 184 N.C. App. 413, 419, 646 S.E.2d 381, 385 (2007) (quoting Johnson v. Ruark Obstetrics, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990)).

Following the Plaintiff's transfer on June 12, 2019, she was treated by three mental health providers for anxiety and trouble sleeping. [Ponder Dep., Doc. 23-1 at 243-44]. The Plaintiff also described herself as "upset" and "embarrassed" following interactions she had with Chief Burnette in which he called her a "disappointment" and a "poor leader." [See, e.g., id. at 55, 110, 125]. During these interactions, the Plaintiff told Chief Burnette that he needed "to stop doing this" and asked for other individuals to be present in the room. [Id. at 125, 158]. During the June 12, 2019 meeting, the Plaintiff feared for her job and told Chief Burnette and Deputy Chief Budzinski that she did not "want to be around either of [them], ever." [Id. at 158]. In the grievance that the Plaintiff filed with the City of Asheville, she explained that she told Chief Burnette and Deputy Chief Budzinski that she wanted another individual present at the June 12, 2019 meeting because she found the meeting "kind of intimidating and threatening." [Doc. 23-19 at 24].

In her Amended Complaint, the Plaintiff alleges that the Defendants' actions "were negligent, and resulted in the infliction of severe emotional distress on the Plaintiff." [Doc. 4 at ¶ 132]. However, the Plaintiff does not

present a forecast raising an inference that the Defendants could have reasonably foreseen that their conduct would cause severe emotional distress. [See id. at ¶¶ 130-132]. Moreover, while the Plaintiff's statements to Chief Burnette or Deputy Chief Budzinski during some of their interactions could indicate that she was distressed or anxious, they do not suggest that the Defendants knew or should have known their conduct would cause the Plaintiff severe emotional distress. See Delk v. ArvinMeritor, Inc., 179 F. Supp. 2d 615, 626 (W.D.N.C. Jan. 2, 2002) (granting defendants' motion for summary judgment where the plaintiff did not allege that the defendants could reasonably foresee severe emotional distress and the plaintiff did not offer evidence showing "that the [d]efendants knew or should have known that their conduct would cause not only distress and anxiety but also 'mental anguish'"). Accordingly, the Defendants' Motion for Summary Judgment is granted with respect to the Plaintiff's negligent infliction of emotional distress claim.

## ORDER

**IT IS, THEREFORE, ORDERED THAT** the Defendants' Motion for Summary Judgment [Doc. 18] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)    The Defendants' Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's Title VII claims against Defendant Scott Burnette in his individual capacity, and those claims are hereby **DISMISSED WITH PREJUDICE;**

(2)    The Defendants' Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's Title VII hostile work environment claim, and that claim is hereby **DISMISSED WITH PREJUDICE;**

(3)    The Defendants' Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's intentional infliction of emotional distress claim, and that claim is hereby **DISMISSED WITH PREJUDICE;**

(4)    The Defendants' Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's negligent infliction of emotional distress claim, and that claim is hereby **DISMISSED WITH PREJUDICE;** and

(5)    The Defendants' Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's Title VII disparate treatment claim against Defendant City of Asheville.

**IT IS SO ORDERED.**

Signed: March 7, 2022

Martin Reidinger
Chief United States District Judge